UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT HEDRICK,

                              Plaintiff,

          v.                                                    9:25-CV-0980
                                                                (BKS/PJE)

ALEXANDER ALFRED, et al.,

                              Defendants.
_____

APPEARANCES:

ROBERT HEDRICK
Plaintiff, pro se
23-B-1782
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403

BRENDA K. SANNES
Chief United States District Judge

## DECISION and ORDER

## I.    INTRODUCTION

      Plaintiff Robert Hedrick commenced this action by filing a pro se civil rights complaint

pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in

forma pauperis ("IFP"), a motion for appointment of counsel, a request for court intervention

regarding interference with mail, photocopying, and law library services, and a request to file

a supplemental pleading.  Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application"); Dkt. No. 4

("Motion for Counsel"); Dkt. No. 6 ("Court Order Request"); Dkt. No. 7 ("Supplemental

Pleading Request").

1

By Decision and Order entered on September 25, 2025, this Court reviewed the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), dismissed certain claims without prejudice, and found that the following claims survived sua sponte review: (1) plaintiff's First, Second, Third, Fifth, Sixth, Seventh, Ninth, and Tenth Retaliation Claims; (2) plaintiff's Fourth Amendment unlawful body search claim against defendant Alfred; (3) plaintiff's Eighth Amendment excessive force and sexual abuse claims against defendant Alfred; (4) plaintiff's Eighth Amendment excessive force claims against defendants Femia, Kachare, Freeman, and Stromecki; (5) plaintiff's Eighth Amendment failure-to-intervene claim against defendant Conway; (6) plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Femia; and (7) plaintiff's Eighth Amendment medical indifference claims against defendants Kachare, Czerwinski, Mungo, Storey, Tapia, and Freeman.  *See* Dkt. No. 11 ("September 2025 Order").  The Court also denied plaintiff's Motion for Counsel, the Court Order Request, and the Supplemental Pleading Request without prejudice.  *Id*. at 66.

Presently before the Court are the following: (1) plaintiff's amended complaint, filed as of right, Dkt. No. 16 ("Am. Compl."); (2) plaintiff's motion to file the amended complaint, Dkt. No. 17 ("Motion to Amend"); and (3) plaintiff's motion for preliminary injunctive relief, Dkt. No. 20 ("Preliminary Injunction Motion").

## II.    MOTION TO AMEND

Three days after plaintiff's amended complaint was filed, the Court received the Motion to Amend.

Rule 15(a) of the Federal Rules of Civil Procedure, which governs amended pleadings before trial, permits a party to amend its pleading once as a matter of course at any point before service of its initial pleading.  *See* Fed. R. Civ. P. 15(a)(1).  In this case, plaintiff filed his amended complaint before providing the Court with copies of his original complaint for

service.

Accordingly, the Motion to Amend is denied as unnecessary.

## III.    SUFFICIENCY OF THE AMENDED COMPLAINT

### A.    The Complaint and September 2025 Order

In the original complaint, plaintiff asserted Section 1983 claims arising out of an alleged wrongdoing while he was incarcerated at Mid-State Correctional Facility.  *See generally*, Compl.  Generally speaking, the original complaint alleged that plaintiff was assaulted on various occasions between September 30, 2024 and June 2025, deprived of adequate medical treatment during this time, and exposed to these and other harms for retaliatory reasons.

The complaint was liberally construed to assert the following Section 1983 claims against the named defendants: (1) First Amendment retaliation claims against defendants John Doe #1 and Edict based on the events of October 1, 2024 ("First Retaliation Claim"); (2) First Amendment retaliation claims against defendants Alfred and Matz based on the events of October 5, 2024 ("Second Retaliation Claim"); (3) First Amendment retaliation claims against defendants Tazouac and Orisin based on terminating plaintiff from his messhall job and falsely charging him with wrongdoing ("Third Retaliation Claim"); (4) a First Amendment retaliation claim against defendant Conway based on issuing plaintiff a false misbehavior report ("Fourth Retaliation Claim"); (5) a First Amendment retaliation claim against defendant Kachare based on changes to plaintiff's pain medication and the denial of medical treatment in response to his complaints ("Fifth Retaliation Claim"); (6) a First Amendment retaliation claim against defendant Femia based on the events of February 15, 2025 ("Sixth Retaliation Claim"); (7) a First Amendment retaliation claim against defendant Mungo based on her role

in depriving plaintiff of access to adequate medical treatment ("Seventh Retaliation Claim");

(8) a First Amendment retaliation claim against defendant Czerwinski based on her role in

removing plaintiff from MAT Program ("Eighth Retaliation Claim"); (9) a First Amendment

retaliation claim against defendant Freeman based on his role in removing plaintiff from MAT

Program ("Ninth Retaliation Claim"); (10) a First Amendment retaliation claim against

defendant Tapia based on depriving plaintiff of access to legal supplies and refusal to

process plaintiff's grievances ("Tenth Retaliation Claim"); (11) a Fourth Amendment unlawful

body search claim against defendant Alfred; (12) a Fourth Amendment unlawful cell search

claim against defendant John Doe #1; (13) Eighth Amendment excessive force and sexual

abuse claims against defendant Alfred; (14) Eighth Amendment cover up claims against

defendants Edict and John Doe #1 based on the events of October 1, 2024; (15) an Eighth

Amendment excessive force claim against defendant Femia; (16) an Eighth Amendment

excessive force claim against defendant Kachare based on the medical examination that

occurred on January 29, 2025; (17) Eighth Amendment excessive force claims against

defendants Freeman and Stromecki; (18) an Eighth Amendment failure-to-protect claim

against defendant Laliberte; (19) an Eighth Amendment failure-to-protect claim against

defendant Riley based on the events of January 29, 2025; (20) an Eighth Amendment failure-

to-intervene claim against defendant Conway; (21) an Eighth Amendment conditions-of-

confinement claim against defendant Femia; (22) Eighth Amendment medical indifference

claims against defendants Kachare, Czerwinski, Mungo, Fischer, Bishop, Hilton, Martuscello,

Storey, Tapia, and Freeman; (23) Eighth Amendment cover up claims against defendants

Czerwinski, King, Kachare, and Mungo based on the destruction of medical records; (24)

Fourteenth Amendment disciplinary due process claims against defendants Tazouac, Orisin,

4

and Conway based on the issuance of false misbehavior reports; (25) a Fourteenth

Amendment destruction of property claim against defendant John Doe #1; (26) Fourteenth

Amendment medical privacy claims against defendants Kachare and Edict; and (27)

Fourteenth Amendment due process claims based on the interference with plaintiff's access

to grievance channels. *See* September 2025 Order at 20-22.

Following review of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C.

§ 1915A(b), the following claims were found to survive sua sponte review: (1) plaintiff's First,

Second, Third, Fifth, Sixth, Seventh, Ninth, and Tenth Retaliation Claims; (2) plaintiff's Fourth

Amendment unlawful body search claim against defendant Alfred; (3) plaintiff's Eighth

Amendment excessive force and sexual abuse claims against defendant Alfred; (4) plaintiff's

Eighth Amendment excessive force claims against defendants Femia, Kachare, Freeman,

and Stromecki; (5) plaintiff's Eighth Amendment failure-to-intervene claim against defendant

Conway; (6) plaintiff's Eighth Amendment conditions-of-confinement claim against defendant

Femia; and (7) plaintiff's Eighth Amendment medical indifference claims against defendants

Kachare, Czerwinski, Mungo, Storey, Tapia, and Freeman. *See* September 2025 Order at

64.

**B.    Review of the Amended Complaint**

Because plaintiff is proceeding in forma pauperis and is an inmate suing one or more

government employees, his amended complaint must be reviewed in accordance with 28

U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).  The legal standard governing the review

of a pleading pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed

at length in the September 2025 Order and it will not be restated in this Decision and Order.

*See* September 2025 Order at 3-5.

As with the original complaint, plaintiff's amended complaint re-asserts Section 1983 claims based on alleged wrongdoing that occurred during plaintiff's confinement at Mid-State Correctional Facility. *See generally*, Am. Compl. The amended complaint also asserts Section 1983 claims based on alleged wrongdoing that occurred following plaintiff's transfer to Marcy Correctional Facility from Mid-State Correctional Facility. *Id.* The amended complaint is materially similar to, albeit more detailed than, the original complaint, and also includes supplemental allegations of wrongdoing that occurred after the date of the last incident of wrongdoing identified in the original complaint. The following facts are set forth as alleged in the amended complaint.[1]

On September 30, 2024, plaintiff was sexually assaulted by defendant Alfred during a search. Am. Compl. at 2-3.

After plaintiff was seen by a nurse on October 1, 2024, he met with defendant Deputy of PREA Laliberte. Am. Compl. at 4. Before the meeting, defendant Laliberte spoke with "security who fill[ed] her in on the situation." *Id.* Defendant Laliberte told plaintiff that she would follow up with him and sign him up for phone counseling, but this never happened. *Id.* Later that day, plaintiff was "walking to medication" and informed defendant Laliberte about defendant John Doe #1 stealing "evidence" from plaintiff's locker. Am. Compl. at 5. Defendant Laliberte "promised to meet with [plaintiff] to discuss this [issue]" but never did so. *Id.*

On October 20, 2024, defendant Femia stopped plaintiff near the messhall and informed him that he was "a target" at the infirmary. Am. Compl. at 5. Thereafter, plaintiff

---

[1] For the sake of brevity, and with limited exception, the Court will not restate the factual allegations that were already summarized in the September 2025 Order. Instead, and except as necessary for context, the factual summary set forth herein is comprised of plaintiff's new allegations

visited the infirmary to receive his prescribed medication and discovered that his nerve pain medication had been reset to a lower dosage by defendant Dr. Kachare, without medical justification. *Id.* at 6.

On December 29, 2024, a fellow inmate cut plaintiff on the cheek with an "improvised sharp weapon . . . directly in front of a group of officers[,]" including defendant Conway. Am. Compl. at 7. Following the altercation, plaintiff was transported to the medical unit. *Id.* Plaintiff suffered significant facial injuries as a result of the assault. *Id.*

Thereafter, defendant Conway issued plaintiff a misbehavior report charging him with fighting and violent conduct. Am. Compl. at 7. The misbehavior report did not mention that plaintiff was attacked with a weapon. *Id.* Ultimately, plaintiff was "vindicated" at his disciplinary hearing. *Id.* The inmate who assaulted plaintiff was "transfer[red] to the dorm of his preference" and given a maintenance job. *Id.*

Between January and April 2025, plaintiff continued to experience inadequate medical treatment, and was subjected to other incidents of harm. Am. Compl. at 8-18. At various points, plaintiff filed grievances regarding certain incidents of wrongdoing, which were disregarded by defendant Tapia. *Id.*

After defendant Tapia failed to process a grievance authored by plaintiff on March 10, 2025, he wrote to defendants Deputy Superintendent of Programs Fischer, Mid-State Correctional Facility Superintendent Hilton, and Mid-State Correctional Facility First Deputy Superintendent Bishop "begging for help" and "explain[ing]" both "the deliberate indifference to his medical needs and Tapia's techniques to thwart [plaintiff] from exhausting his grievance remedies." Am. Compl. at 17. On or about April 23, 2025, plaintiff spoke with defendant Fischer regarding his medical needs and defendant Tapia's failure to process his grievances.

7

*Id.* at 18.  Defendant Fischer "promise[d]" plaintiff that if plaintiff sent a grievance directly to him, it would be processed.  *Id.*

On April 23, 2025, defendant Fischer stamped a grievance from plaintiff as "received" and added "a warning note on the top of the page" that reads, "Tapia, he's grieving you."  Am. Compl. at 19.  That same grievance was stamped as received by defendant Tapia on June 2, 2025.  *Id.*  Defendant Tapia denied the grievance as untimely.  *Id.*

On May 30, 2025, defendants Mungo, Kachare, and Czerwinski formed an "agreement" with defendants Corrections Officers Freeman and Stromecki to have plaintiff "removed from the MAT Program" by charging him with diverting his medication.  Am. Compl. at 22-23.  When plaintiff arrived at the medical facility to receive and consume his suboxone, he was "oddly" called first to the window, where he saw defendants Mungo, Kachare, and Czerwinski.  *Id.* at 23.  Upon arriving at the window, plaintiff was given his Suboxone, which he placed on the bottom of his tongue before heading toward the door.  *Id.*  Plaintiff was confronted by defendant Freeman as he was leaving.  *Id.*  Defendant Freeman accused plaintiff of "diverting" his medication, "grabbed" him, and "slam[med]" him against the wall.  *Id.*  Plaintiff was eventually placed in handcuffs and confined in a holding area.  *Id.*

The next day, plaintiff filed a grievance regarding the events of May 30, 2025.  Am. Compl. at 26.  That same day, plaintiff arrived at the medical facility to learn that defendant Kachare discontinued his Suboxone prescription.  *Id.* at 24.  On June 3, 2025, plaintiff was seen by Dr. Kachare, who informed plaintiff that he would not receive pain medication as a result of the incident involving defendant Freeman.  *Id.*  After plaintiff stated his concerns, defendant Kachare agreed to a detox "in a[n] extremely fast and unreasonable manner."  *Id.* at 24-25.

On June 4, 2025, plaintiff asked defendant Deputy of Medical Storey "to investigate" his prior complaints of deliberate indifference and the discontinuation of his medication. Am. Compl. at 26. Defendant Storey advised plaintiff that he received a ticket for the events of May 30, 2025, and if he was found not guilty of the charges in the misbehavior report he would be placed back on his medications. *Id.* At the time, plaintiff had yet to receive a misbehavior report. *Id.* Defendant Storey chose not to intervene to ensure that plaintiff received his medications despite seeing his declining state. *Id.* at 26-27.

On June 10, 2025, a misbehavior report authored by defendant Freeman was served on plaintiff following plaintiff's meeting with defendant Tapia "to clear the air," during which plaintiff refused to sign off on grievances. Am. Compl. at 26.

On the morning of June 16, 2025, plaintiff was called to the "Adjustment Building" where he met with defendant Corrections Lieutenant Wells. Am. Compl. at 27. Defendant Wells informed plaintiff that he was being "called for his ticket hearing" related to the misbehavior report issued by defendant Freeman. *Id.*

Thereafter, plaintiff attended his disciplinary hearing and called "numerous witnesses[,]" including defendants Kachare, Czerwinski, Mungo, Femia, Freeman, and Corrections Sergeant Slate. Am. Compl. at 27. During cross-examination of defendant Freeman, plaintiff "confront[ed]" this official with video evidence showing that what this official wrote in the misbehavior report was "mostly false." *Id.* Plaintiff was also able to show during the hearing that defendant Slate "made a fake report . . . saying a National Guard [officer] subdued and cuffed [plaintiff]" when defendant Freeman "admitted" that "he was the one that subdued and cuffed [plaintiff.]" *Id.* at 28. Despite showing that "Freeman was lying and Slate's documentary record evidence was false[,]" defendant Wells found plaintiff guilty of the

9

charges in the misbehavior report and sentenced him to a loss of packages, commissary, tablet, and recreation privileges.  *Id.*  The guilty determination also resulted in plaintiff's removal from the "MAT Program after 27 months of successful treatment[.]"  *Id.*

Following the disciplinary determination, defendant Wells "turn[ed] off [plaintiff's] phone" and directed defendant Corrections Officer Smalls to "take [plaintiff's] tablet" to prevent him from accessing law library privileges and communicating with his family.  Am. Compl. at 28, 47.  Plaintiff appealed the disciplinary determination to defendant Superintendent Delmar, who affirmed the ruling.  *Id.* at 28.

On June 19, 2025, plaintiff complained to a nurse about "extreme pain" and swelling from his facial fracture and asked to be seen by emergency sick call.  Am. Compl. at 29. Thereafter, defendant King stopped plaintiff at the medical facility and "scream[ed]" at plaintiff to take his medication while preventing him from speaking to the nurse regarding his medical issues.  *Id.* at 29, 49.

On July 18, 2025, plaintiff was in the infirmary waiting to see defendant Dr. Kachare but was informed by a nurse that Dr. Kachare "refused to meet with him."  Am. Compl. at 29. On July 29, 2025, plaintiff was suffering from a "severe sinus infection" and walked to the infirmary for treatment.  *Id.*  Following his arrival, defendant Corrections Officer Nicholas directed plaintiff to "leave for no reason."  *Id.*

Before leaving the infirmary, plaintiff "plead[ed] for water[,]" explained his condition, and advised that his cell did not have clean water and he had not drank water all day.  Am. Compl. at 29.  Defendant Nicholas still made plaintiff leave the infirmary.  *Id.*

After plaintiff returned to his cell, he requested medical treatment and was forced to "walk roughly a half mile back to medical."  Am. Compl. at 29.  Upon arriving at medical for a

second time, defendant Nicholas "yell[ed]" at plaintiff and falsely accused him of being there

"for twenty minutes." *Id.* Defendant Nicholas then directed plaintiff to "go back out into the

90-100 degree" heat, despite his "health deterioration and current state of extreme

dehydration," and "walk to the fence at the bottom of the hill" before coming back. *Id.* at 30.

After plaintiff complied with defendant Nicholas's directive and returned to the

infirmary, defendant Nicholas directed plaintiff to "get on the wall" for the second time in three

days, "rip[ped] his pants down below his buttocks" and dug into his shorts while "calling him a

drug addict." Am. Compl. at 30. Defendant Nicholas then stole plaintiff's pen "to prevent him

from wri[t]ing and [making] com[p]laints[.]" *Id.*

Thereafter, unidentified officials stole plaintiff's Section 1983 complaint "out of the mail"

and defendant Edict called plaintiff to his office to question him about his actions. Am.

Compl. at 30. During the meeting, defendant Edict asked plaintiff if he was attempting to "get

them fired?" *Id.*

Based on plaintiff's unsuccessful efforts to send mail to the court, he sent a letter to

this court on July 22, 2025, under the name of another prisoner. Am. Compl. at 30. Around

this time, plaintiff's mother also "sent . . . numerous complaints and emails" regarding

plaintiff's treatment. *Id.*

On or about July 23, 2025, Corrections Officer Kilner (not a party) told plaintiff he

"need[ed] to go to medical and see Dr. Chaudhry[.]" Am. Compl. at 30. Plaintiff was

subsequently sent by Dr. Chaudhry to the Emergency Room at an outside hospital where he

was prescribed Suboxone. *Id.*

On July 24, 2025, Dr. Chaudhry saw plaintiff and prescribed him Suboxone "in a lower

dose to start him back slowly." Am. Compl. at 30. Dr. Chaudhry also documented plaintiff's

"shoulder being injured by [defendant] Freeman." *Id.* At the conclusion of the visit, plaintiff encountered defendant Nicholas who "order[ed]" plaintiff to "get on the wall" and searched him because plaintiff "ask[ed] her name when she refused to provide him breakfast." *Id.* at 30-31.

On August 22, 2025, plaintiff was seen by Dr. Chaudhry. Am. Compl. at 31. By this time, plaintiff had lost significant weight and was "vomiting continuously" based on months of suffering. *Id.* Dr. Chaudhry ordered plaintiff "numerous specialist appointments, a special diet, a chronic pain management plan, an instant x-ray" and "a CT Scan" for "further medical imaging." *Id.* Dr. Chaudhry also "changed and increased" plaintiff's pain medication and ordered an antibiotic for his infected sinuses. *Id.* Dr. Chaudhry then spoke with defendants Czerwinski and Mungo to inform them of the intended course of treatment. *Id.*

Later that day, plaintiff spoke with a fellow prisoner "about imminent litigation." Am. Compl. at 31-32. The discussion was overheard by defendant Delmar. *Id.* at 32. That night, plaintiff went to "the medication window" and was "surrounded and handcuffed by 2 C.O.'s and an unknown sergeant." *Id.* Plaintiff was then escorted to a holding area and informed by defendant Corrections Sergeant Dundon that defendant Delmar "called and approved" plaintiff's transfer to another facility on the grounds that he had "a hit out" on him. *Id.* The alleged "hit" was "a complete lie." *Id.*

Defendant Dundon "wrote a false information" regarding the "hit" to transfer plaintiff out of the facility, to Marcy Correctional Facility. Am. Compl. at 32.

After notifying plaintiff about his impending transfer, defendant Dundon subjected plaintiff to a strip search in the bathroom of the medical facility, in the presence of two other corrections officials who were recording the search. Am. Compl. at 53. Plaintiff believes that

"[s]tripping a prisoner on camera and having him spread his anal cavity is a completely unreasonable search and serves no penological interests."  *Id.* at 54.

During plaintiff's initial four days at Marcy Correctional Facility, he did not receive any of his prescribed medications, causing him to suffer vomiting, diarrhea, and a loss of sleep. Am. Compl. at 32.  On August 26, 2025, plaintiff requested emergency sick call and met with defendant Nurse Garcia, who informed plaintiff that she was "doing . . . orders" and asked him whether he was "on Suboxone."  *Id.*  Plaintiff responded that he was taking Subutex, not Suboxone.  *Id.*  The next day, plaintiff learned that the facility has "a neutral policy" that prohibits inmates from receiving Subutex.  *Id.*  Plaintiff "wrote two grievances" regarding this matter, but neither were answered.  *Id.*

Plaintiff's primary provider, defendant Nurse Practitioner Coriglianno, "failed to see him" during this time even after plaintiff wrote his grievances and explained his suffering from withdrawal.  Am. Compl. at 32.  As a result, plaintiff's "treatment . . . halted and the medication and special diet that would have helped him begin to recover were not provided." *Id.*

In addition to the aforementioned officials and those identified as defendants in the original complaint, the amended complaint also names the New York State Correction Officers & Police Benevolent Association ("NYSCOPBA"), "CERT Team Does 1-50," New York State Department of Corrections and Community Supervision ("DOCCS") Commissioner Martuscello and Superintendent Hilton as defendants based on allegations that members of NYSCOPBA "abandon[ed] their posts" and left "prisoners to fend for themselves" during the "illegal" labor strike that occurred between February and March 2025, and defendants Martuscello and Hilton "allow[ed]" the "CERT Team Doe" officials to "run around the

compound during the illegal strike terrorizing and menacing prisoners with batons."  Am. Compl. at 20-21, 52-53.  According to plaintiff, defendants Hilton and Martuscello were aware of, and failed to investigate or address, corrections officials "brutally assaulting" inmates over the years, which he believes created the environment that resulted in the physical abuses that he suffered.  *Id.* at 16, 20-21; 34-35; 48.

Liberally construed, the amended complaint asserts the following Section 1983 claims against the named defendants: (1) First Amendment retaliation claims against defendants John Doe #1 and Edict based on the events of October 1, 2024 ("First Retaliation Claim"); (2) First Amendment retaliation claims against defendants Alfred and Matz based on the events of October 5, 2024 ("Second Retaliation Claim"); (3) First Amendment retaliation claims against defendants Tazouac and Orisin based on terminating plaintiff from his messhall job and falsely charging him with wrongdoing ("Third Retaliation Claim"); (4) a First Amendment retaliation claim against defendant Conway based on issuing plaintiff a false misbehavior report ("Fourth Retaliation Claim"); (5) a First Amendment retaliation claim against defendant Kachare based on changes to plaintiff's pain medication and the denial of medical treatment in response to his complaints ("Fifth Retaliation Claim"); (6) a First Amendment retaliation claim against defendant Femia based on the events of February 15, 2025 ("Sixth Retaliation Claim"); (7) a First Amendment retaliation claim against defendant Mungo based on her role in depriving plaintiff of access to adequate medical treatment ("Seventh Retaliation Claim"); (8) a First Amendment retaliation claim against defendant Czerwinski based on her role in removing plaintiff from the MAT Program ("Eighth Retaliation Claim"); (9) First Amendment retaliation claims against defendants Freeman, Stromecki, Wells, Femia, Slate, and Delmar based on their roles in removing plaintiff from the MAT Program ("Ninth Retaliation Claim");

14

(10) a First Amendment retaliation claim against defendant Tapia based on depriving plaintiff of access to legal supplies and refusing to process plaintiff's grievances ("Tenth Retaliation Claim"); (11) a First Amendment retaliation claim against defendant Fischer based on the handling of plaintiff's complaints and grievances related to defendant Tapia ("Eleventh Retaliation Claim"); (12) First Amendment retaliation claims against defendants Wells and Smalls based on the revocation of plaintiff's telephone privileges and tablet access ("Twelfth Retaliation Claim"); (13) a First Amendment retaliation claim against defendant Nicholas based on denying plaintiff access to medical treatment ("Thirteenth Retaliation Claim"); (14) First Amendment retaliation claims against defendants Delmar and Dundon based on the creation of false reports and facilitation of plaintiff's transfer to Marcy Correctional Facility ("Fourteenth Retaliation Claim"); (15) First Amendment access-to-courts claims against defendants Wells and Smalls based on the revocation of plaintiff's telephone privileges and tablet access; (16) First Amendment free association claims against defendants Wells and Smalls based on the revocation of plaintiff's telephone privileges and tablet access; (17) a First Amendment mail tampering claim against defendant Edict; (18) Fourth Amendment unlawful body search claims against defendants Alfred and Dundon; (19) Eighth Amendment excessive force and sexual abuse claims against defendant Alfred; (20) an Eighth Amendment excessive force claim against defendant Femia; (21) an Eighth Amendment excessive force claim against defendant Kachare based on the medical examination that occurred on January 29, 2025; (22) Eighth Amendment excessive force claims against defendants Freeman and Stromecki; (23) Eighth Amendment failure-to-protect claims against defendants Laliberte, Edict, and John Doe #1; (24) an Eighth Amendment failure-to-protect claim against defendant Alfred based on attempting to have plaintiff assaulted on or about

October 5, 2024; (25) an Eighth Amendment failure-to-protect claim against defendant Femia based on the events of October 20, 2024; (26) Eighth Amendment failure-to-protect claims against NYSCOPBA, CERT Team Does 1-50, and defendants Hilton and Martuscello; (27) an Eighth Amendment failure-to-intervene claim against defendant Conway; (28) an Eighth Amendment conditions-of-confinement claim against defendant Femia; (29) Eighth Amendment medical indifference claims against defendants Kachare, Czerwinski, Mungo, Fischer, Bishop, Hilton, Martuscello, Storey, Tapia, Freeman, Stromecki, Femia, Slate, Delmar, King, Nicholas, Garcia, and Coriglianno based on preventing plaintiff from receiving adequate medical treatment; (30) Eighth Amendment medical indifference claims against defendants Mungo, Czerwinski, Kachare, and King based on the destruction of medical records; (31) Fourteenth Amendment disciplinary due process claims against defendants Wells, Freeman, and Delmar arising out of the misbehavior report and disciplinary determination that resulted in plaintiff's removal from the MAT program; and (32) claims under Title II of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") arising out of plaintiff's receipt of inadequate medical treatment.

For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C.    Analysis

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp*., 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272

(TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)).  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

The Second Circuit recently made clear that "there is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  If a defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

17

### 1. Reasserted Claims That Previously Survived Sua Sponte Review

As noted, the allegations in the amended complaint are materially similar to the allegations in the original complaint with respect to plaintiff's Section 1983 claims that previously survived sua sponte review. Accordingly, and for the reasons set forth in the September 2025 Order, the following claims once again survive sua sponte review and require a response: (1) plaintiff's First, Second, Third, Fifth, Sixth, Seventh, Ninth, and Tenth Retaliation Claims; (2) plaintiff's Fourth Amendment unlawful body search claim against defendant Alfred; (3) plaintiff's Eighth Amendment excessive force and sexual abuse claims against defendant Alfred; (4) plaintiff's Eighth Amendment excessive force claims against defendants Femia, Kachare, Freeman, and Stromecki; (5) plaintiff's Eighth Amendment failure-to-intervene claim against defendant Conway; (6) plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Femia; and (7) plaintiff's Eighth Amendment medical indifference claims against defendants Kachare, Czerwinski, Mungo, Storey, Tapia, and Freeman. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 2. Reasserted Claims That Were Previously Dismissed

In light of the new allegations set forth in the amended complaint, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that the following claims, which were previously dismissed, survive sua sponte review and require a response: (1) the Fourth Retaliation Claim; (2) the Eighth Retaliation Claim; (3) plaintiff's failure-to-protect claim against defendant Laliberte; and (4) plaintiff's medical

indifference claim against defendant Fischer.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

Insofar as the amended complaint reasserts medical indifference claims against defendants Bishop, Hilton, and Martuscello, as with the original complaint, the amended complaint does not allege that (1) plaintiff ever spoke with any of these officials regarding his medical treatment, or (2) any of these officials ever responded to plaintiff's complaints regarding his medical treatment.  Moreover, even assuming these officials may have been aware of plaintiff's concerns regarding his medical treatment, the pleading does not allege that any of them are medical professionals, and this is not a case in which plaintiff alleges that he was denied medical treatment altogether.  Thus, the Court has no basis to plausibly infer that defendants Bishop, Hilton, or Martuscello were personally involved in denying plaintiff access to adequate medical treatment and/or acted with deliberate indifference to his serious medical needs at any point.  *See, e.g., Cato v. Reardon*, No. 22-CV-1173 (AMN/CFH), 2024 WL 1307115, at *11 (N.D.N.Y. Mar. 27, 2024) ("In light of *Tangreti*, plaintiff's attempt to plead personal involvement based upon the receipt of grievances or letters, lacks merit because it does not plausibly suggest "[t]he factors necessary to establish" a constitutional claim."); *Verdi v. Farah*, No. 9:22-CV-0825 (BKS/CFH), 2022 WL 4236401, at *7 (N.D.N.Y. Sept. 14, 2022) (holding that, even assuming the defendant "received and read [the] plaintiff's letters, and that *Tangreti* did not entirely eliminate supervisory liability under a failure-to-remedy theory, [the] defendant['s] alleged refusal to override the grievance process does not plausibly suggest" that he violated the plaintiff's constitutional rights).

Accordingly, plaintiff's medical indifference claims against defendants Martuscello, Hilton, and Bishop are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 3.  Newly Asserted Retaliation Claims

The legal standard governing First Amendment retaliation claims was discussed at length in the September 2025 Order and will not be restated herein.  *See* September 2025 Order at 24-29.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that the Eleventh Retaliation Claim, Twelfth Retaliation Claim, Thirteenth Retaliation Claim, and Fourteenth Retaliation Claim all survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 4.  Mail Tampering Claim

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  A prisoner's mail may only be restricted to further "'one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'"  *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]"  *Davis*, 320 F.3d at 351.  "While a prisoner has a right to

be present when his legal mail is opened, . . . an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's mail tampering claim against defendant Edict survives sua sponte review and requires a response.  In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 5. Access-to-Courts Claim

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith* 430 U.S. 817, 828 (1977), *modified on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004). "However, this right is not 'an abstract, freestanding right . . . .' and cannot ground a Section 1983 claim without a showing of 'actual injury.'" *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense").

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint . . . ." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id*. at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id*. at 417-18 (footnote omitted).

"Finally, . . . the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] . . . to challenge the conditions of [his]

confinement." *Id*. at 355.  "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*.

In this case, plaintiff alleges that he was unable to access virtual law library services as a result of defendants Wells and Smalls taking away his tablet for an unidentified period of time.  Am. Compl. at 28, 47.

As an initial matter, the amended complaint does not allege that plaintiff was denied physical access to the law library after his tablet was confiscated.  Moreover, the pleading does not include any details regarding any court proceeding that plaintiff was unable to litigate or prosecute as a result of not having access to law library privileges through his tablet.  Thus, the Court has no basis to plausibly infer that plaintiff suffered any sort of injury as a result of the alleged denial of tablet access for an unidentified period of time.  *See Lewis*, 518 U.S. at 351 (explaining that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense"); *Flores v. City of New York*, No. 21-CV-1680, 2022 WL 4705949, at *16 (S.D.N.Y. Aug. 8, 2022) (finding that incarcerated individual failed to state an access-to-courts claim based on denial of access to the law library on certain occasions because the complaint did not "allege how the denial of law library access on certain occasions, including the lack of a legal kiosk and typewriter, hindered [the plaintiff's] efforts to pursue legal challenges in his criminal case, as he [did] not assert that he missed any deadlines, was prevented from hand writing his letters and/or briefs, or that he was prevented from or delayed in filing any legal document in his criminal case" or otherwise suffered "an actual injury, such as dismissal of a meritorious claim"), *report and recommendation adopted by* 2022 WL 4592892 (S.D.N.Y. Sept. 30, 2022).

23

In light of the foregoing, plaintiff's access-to-courts claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 6. Free Association Claim

It is well settled that a prisoner retains the right under the First Amendment to communicate with family and friends. *See Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974); *Morgan v. La Vallee*, 526 F.2d 221, 225 (2d Cir. 1975). However, this right is not limitless. *See Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977); *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Indeed, "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). "Thus, although the Constitution 'protects certain kinds of highly personal relationships' and there exists 'a right to maintain certain familial relationships ...,' '[s]ome curtailment of that freedom must be expected in the prison context.'" *Miller v. Annucci*, No. 17-CV-4698, 2019 WL 4688539, at *13 (S.D.N.Y. Sept. 26, 2019) (quoting *Overton*, 539 U.S. at 131); *see also Mills v. Fischer*, 497 Fed. App'x 114, 116 (2d Cir. 2012) (summary order) ("Assuming that prisoners have a right under the First Amendment to have family visits, that right could not require that visits by family members be permitted on demand, but rather must be subject to reasonable restrictions on the time, place[,] and manner of visits." (citing *Overton*, 539 U.S. at 132)); *Henry v. Davis*, No. 10-CV-7575, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world.")); *Ahlers v. Townsend*, No. 9:12-CV-0575

(DNH/TWD), 2014 WL 4365277, at *5 (N.D.N.Y. Aug. 28, 2014) (same); *Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2016 WL 11807252, at *5 (N.D.N.Y. Dec. 19, 2016) (same).

In this case, the amended complaint alleges that defendant Wells revoked plaintiff's phone and tablet privileges for a period of 60 days as a result of finding him guilty of a disciplinary infraction. *See* Am. Compl. at 28.

As an initial matter, the amended complaint does not allege that plaintiff had no other means of communicating with his family during this 60-day period. Moreover, the law is well-settled that the brief deprivation of telephone privileges as part of a disciplinary sanction is not a constitutional violation. *See, e.g., Marcus v. Annucci*, No. 20-CV-6234, 2022 WL 280935, at *2, *6 (S.D.N.Y. Jan. 31, 2022) (finding no constitutional violation in a SHU sentence that involves, inter alia, the loss of "recreation, packages, commissary, and phone privileges for ninety days").

Accordingly, plaintiff's First Amendment free association claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 7. Unlawful Body Search Claim Against Dundon

The legal standard governing Fourth Amendment unlawful body search claims was discussed at length in the September 2025 Order and will not be restated herein. *See* September 2025 Order at 31-32.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's unlawful search claim against defendant Dundon survives sua sponte review and requires a response.

In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 8. Failure-to-Protect Claims Against Edict, John Doe #1, Alfred, and Femia

The legal standard governing Eighth Amendment failure-to-protect claims was discussed at length in the September 2025 Order and will not be restated herein. *See* September 2025 Order at 35-40.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's failure-to-protect claims against defendants Edict, John Doe #1, Alfred, and Femia sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 9. Medical Indifference Claims Against Stromecki, Femia, Slate, Delmar, King, Nicholas, Garcia, and Coriglianno

The legal standard governing Eighth Amendment medical indifference claims was discussed at length in the September 2025 Order and will not be restated herein. *See* September 2025 Order at 45-49.

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's medical indifference claims against defendants Stromecki, Femia, Slate, Delmar, King, Nicholas, Garcia, and Coriglianno based on preventing, or interfering with, plaintiff's access to adequate medical treatment survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

Insofar as plaintiff seeks to assert an independent Eighth Amendment claim against defendants Mungo, Czerwinski, Kachare, and King based on the destruction of medical records, there are several problems with allowing such a claim to survive sua sponte review. First, the case on which plaintiff relies, *Wesley v. Davis*, 333 F. Supp. 2d 888 (C.D. Cal. 2004), dealt with the intentional shredding of the inmate plaintiff's medical records as a form of punishment for his failure to comply with a demand to drop a legal appeal. *Id*. at 894-95. While this Court is not necessarily persuaded by the ruling in *Wesley*, the facts of that case are easily distinguishable from this case, where the amended complaint does not allege that plaintiff's medical records were destroyed by defendants Mungo, Czerwinski, Kachare, and King. Rather, plaintiff alleges that records of his sick call requests, along with unidentified records of other prisoners, were destroyed by these officials. Am. Compl. at 22, 50. Thus, the Court is unable to plausibly infer either that (1) any treatment, examination, or diagnostic records related to plaintiff were destroyed, or (2) the destruction of records was based on a targeted effort to punish plaintiff specifically.

Second, plaintiff has not indicated (1) what specific records of his were destroyed other than sick call requests, if any, or (2) how the destruction of such records impacted the medical treatment that he received. *See Martin v. Garza*, No. 06-CV-1095, 2007 WL 2288127, at *13 (S.D. Cal. Aug. 7, 2007) ("With respect to Plaintiff's allegations against Defendant Washington, withholding of medical records or the denial of delivery of medical records does not constitute a violation of the Eighth Amendment when no injury resulted from the actions, nor were any existing injuries worsened."); *Wade v. Mills*, No. 19-CV-2150, 2021 WL 689106, at *3 (D. N.J. Feb. 23, 2021) ("[N]o New Jersey state or federal court has recognized any constitutional right to access medical records which would support a § 1983

27

claim."); *Smith v. Myers*, No. 16-CV-919, 2019 WL 9904324, at *5 (M.D. Ala. Dec. 30, 2019) (collecting cases holding that Fourteenth Amendment does not create an unrestricted property right to inspect and copy one's own medical records), *report and recommendation adopted by* 2020 WL 4819535 (M.D. Ala. Aug. 19, 2020); *Blanton v. Blue*, No. 16-CV-10, 2016 WL 2858922, at *3 (W.D. Ky. May 16, 2016) ("Moreover, with regard to his allegations that he was not given a copy of his medical records, a prisoner has no constitutional right to review or obtain copies of his prison medical records."); *Ball v. Famiglio*, No. 08-CV-0700, 2011 WL 1304614, at *9 (M.D. Pa. Mar. 31, 2011) ("While inmates have a constitutional right to access to medical care, there is no authority for an Eighth Amendment right to review medical records.") (citation omitted).

Third, the Supreme Court has held that even the unauthorized intentional destruction of a prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *see also Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post deprivation remedy."). "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 Fed. App'x 397, 400 (2d Cir. 2009) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property]."). Moreover, the amended complaint is devoid of allegations which plausibly suggest that adequate post-deprivation remedies were not available to plaintiff with respect to the

destruction of any records.  *See Johnson v. Fischer*, No. 9:12-CV-0210 (DNH/TWD), 2015 WL 670429, at *1, *38 (N.D.N.Y. Feb. 17, 2015) (noting that allegations that corrections officers "stole legal documents from [plaintiff's cell, and destroyed his personal property (e.g., family photographs and letters)" were insufficient to ... state[ ] an actionable constitutional claim because New York state law provides [plaintiff] with an adequate post-deprivation remedy, i.e., § 9 of the Court of Claims Act").

Fourth, the Court has no basis to plausibly infer that the alleged destruction of sick call requests will prevent plaintiff from litigating his medical indifference claims in this action. *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (explaining that even if a backward-looking access-to-courts claim is actionable, such a claim is "available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." (quoting *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006))).

In light of the foregoing, plaintiff's Eighth Amendment claims based on the destruction of sick call records is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.[2]

**10. Disciplinary Due Process Claims Against Wells, Freeman, and Delmar**

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d

---

[2]  For the sake of clarity, the Court notes that, although the alleged destruction of sick call records does not support an independent Eighth Amendment claim, discovery on this subject may be relevant to the issue of deliberate indifference with respect to the treatment plaintiff received.

Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996).

In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484). When assessing the severity of the hardship imposed, a court should take into account both the duration and the conditions of the confinement, where appropriate. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that disciplinary confinement, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231. As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an

'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration -- between 101 and 305 days -- 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." (citing *Colon*, 215 F.3d at 232)).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, inter alia, *Wolff v. McDonnell*, 418 U.S. 539, 563- 67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

In this case the amended complaint alleges that defendant Wells found plaintiff guilty of the charges in the misbehavior report issued by defendant Freeman and sentenced him to a loss of tablet, phone, commissary, recreation, and packages privileges for 60 days. Am. Compl. at 28.

Even assuming that plaintiff was denied the process to which he was entitled, a loss of privileges for 60 days, without any accompanying restrictive confinement, does not trigger a liberty interest. *See, e.g., Burrell v. Durkin*, No. 9:22-CV-0102 (BKS/ML), 2022 WL 22955445, at *11 (N.D.N.Y. Apr. 20, 2022) ("Defendant LeClaire, however, sanctioned

31

plaintiff only to 10 days of SHU confinement and 90 days loss of commissary, packages, and phone privileges. . . . None of these sanctions constitute an atypical or significant hardship under the Due Process Clause."); *Taylor v. Glover*, No. 21-CV-06452, 2024 WL 5090172, at *8 (S.D.N.Y. Dec. 11, 2024) ("[C]ourts in the Second Circuit have consistently held the loss of commissary, package, and visitation privileges does not implicate liberty interests."); *McLellan v. Chapdelaine*, No. 16-CV-02032, 2017 WL 388804, at *4 (D. Conn. Jan. 27, 2017) (holding that loss of commissary for sixty days did not constitute significant or atypical hardship); *Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2016 WL 11906586, at *6 (N.D.N.Y. Oct. 19, 2016) ("[P]laintiff has not alleged facts which plausibly suggest that he enjoyed a protected liberty interest in being free from the sanction related to the conditions of his confinement – ninety (90) days loss of privileges."); *Alexander v. Fischer*, No. 9:14-CV-0548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y. Dec. 21, 2015) ("The loss of visitation and related privileges, the only other deprivations identified by plaintiff, do not rise to the level of an 'atypical and significant hardship' so as to create a liberty interest protected by procedural due process."), adopted by 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("[T]he loss of phones, packages, and commissary privileges does not  give rise to a protected liberty interest under New York law.").

Accordingly, plaintiff's due process claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 10. NYSCOBA

Section 1983 requires "that the alleged deprivation [be] committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant acts under color of state law when he exercises 'some right or privilege created by the State . . . or by a person for whom the State is responsible,' and is 'a person who may fairly be said to be a state actor.'" *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 162 (D. Conn. 2005) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

"The Second Circuit instructs that one of three tests (the 'compulsion test', the 'public function test', and the 'joint action test') must be met to find state action by a private entity." *Porter v. Game*, No. 19-CV-1408, 2020 WL 127580, at *2 (E.D.N.Y. Jan. 9, 2020) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010)). The "compulsion test" analyzes whether "the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state[.]" *Hollander*, 624 F.3d at 34 (citations omitted). The "public function test" analyzes where "the entity 'has been delegated a public function by the [s]tate[.]'" *Id*. Finally, the "joint action test" or "close nexus test" analyzes whether "the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." *Id*.

NYSCOPBA is a labor union, not a public entity. Moreover, the amended complaint is devoid of allegations which plausibly suggest that NYSCOPBA worked jointly with a government entity or official to deprive plaintiff (or any other inmate) of a constitutional right. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (noting that conclusory allegations that a private party acted in concert with a state actor do not suffice to state a Section 1983 claim against a private party). Rather, the amended complaint generically alleges only that NYSCOPBA represents corrections officials employed at Mid-

State Correctional Facility who abandoned their posts, resulting in a more difficult housing environment for plaintiff and other inmates.  Am. Compl. at 52.  However, "[t]he fact that NYSCOPBA represents public employees does not make it a state actor."  *Bell v. New York State Dep't of Corr. & Cmty. Supervision*, No. 17-CV-937, 2019 WL 1305809, at *6 (N.D.N.Y. Mar. 22, 2019) (citing *Marrero v. City of N.Y.*, No. 02-CV-6634, 2003 WL 1621921, at *4 (S.D.N.Y. Mar. 28, 2003)).

Accordingly, plaintiff's Section 1983 claims against NYSCOPBA are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 11. CERT Team Does

When the name of an individual defendant is unknown, it is not inappropriate to identify him or her in the pleading as a "Doe" defendant.  However, the pleading must allege facts sufficient to plausibly suggest that each "Doe" defendant was personally involved in the alleged constitutional deprivations.  *See Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers'" and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint, should Little chose to do so"); *Williams v. 120 PCT Undercover*, No. 11-CV-4690, 2011 WL 13128209, at *1 (E.D.N.Y. Oct. 18, 2011) (dismissing complaint without prejudice where plaintiff's claims provided information about the alleged constitutional deprivations, but were

brought against "the 120 Precinct and District 9, a police precinct and district of the New York City Police Department").

"Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017). In other words, a pleading must allege facts which plausibly suggest both who was involved in the alleged constitutional deprivations, and how they were involved. *See also Cipriani v. Buffardi*, No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." (citing *Gonzalez v. City of New York*, No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998))).

In this case, the amended complaint names fifty "Doe" officials as defendants, without any explanation as to how or when plaintiff interacted with each of these officials. Indeed, it is entirely unclear how any of the "Doe" defendants may have been involved in any alleged incidents of wrongdoing specific to plaintiff. Furthermore, the law is well-settled that a group pleading is insufficient to put any official on notice as to how or when that person may have violated plaintiff's constitutional rights. *See, e.g., Wright v. Orleans Cnty.*, No. 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a Section 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *Traore v.*

*Rikers Island C-95 & C-76*, No. 22-CV-1432, 2022 WL 1556946, at \*4-5 (S.D.N.Y. May 16, 2022) ("Plaintiff names 'Rikers Island C95 and C76 medical staff and correctional officers.' The 'medical staff' is not considered a person under Section 1983. . . . Also, Rikers Island is not a 'person' within the meaning of Section 1983. . . . The Court therefore dismisses Plaintiff's claims against 'Rikers Island C95 and C76 medical staff for failure to state a claim on which relief may be granted.'"); *McCall v. Elmira Corr. Fac. Med. Staff*, No. 14-CV-0258, 2014 WL 1747218, at \*2 (W.D.N.Y. Apr. 29, 2014) (dismissing claims against correctional facility "medical staff" and providing differing reasons for why "[t]he medical staff at Elmira [Correctional Facility] is not a proper defendant").

In light of the foregoing, plaintiff's Section 1983 claims against the "Doe" defendants (other than John Doe #1) are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 12. Failure-to-Protect Claims Against Hilton and Martuscello

As noted, the amended complaint appears to assert Eighth Amendment claims against defendants Hilton and Martuscello based on their alleged failure to adequately investigate and address past incidents of excessive force, which plaintiff believes resulted in him being assaulted by certain corrections officials, and also the negative environment that existed during the "illegal strike." *See* Am. Compl. at 20-21, 34-35, 48, 52-53.

"After *Tangreti*, a failure to train claim cannot be premised simply on the existence of inadequate training or policies established under the supervision of an individual defendant." *Est. of King by & through King v. Annucci*, 693 F. Supp. 3d 310, 326 (N.D.N.Y. 2023); *Myers on behalf of Est. of Myers v. Davenport*, No. 21-CV-0922 (LEK/CFH), 2022 WL 3017367, at

*4 (N.D.N.Y. July 29, 2022) ("Liability based solely [...] due to a failure to supervise, without more, constitutes precisely the type of vicarious, respondeat superior liability that *Iqbal* and *Tangreti* eliminate." (citation omitted)).  "Instead, a plaintiff must point to 'facts showing that each supervisor was aware that his or her actions would cause a substantial risk of harm and then disregarded that risk.'" *Est. of King by & through King*, 693 F. Supp. 3d at 326 (quoting *Crispin v. Peiri*, No. 21-CV-475, 2023 WL 2931846 at *8 (D. Conn. April 13, 2023)); *O'Brien v. City of Syracuse*, No. 22-CV-948 (MAD/TWD), 2023 WL 6066036, at *19 (N.D.N.Y. Sept. 18, 2023) (dismissing claim against supervisor for failure to train and manage staff as "reminiscent of a 'supervisor liability' theory of liability for Section 1983 claims that is no longer available" after *Tangreti*), *reconsideration denied*, 2024 WL 4252052 (N.D.N.Y. Sept. 20, 2024).

In this case, the amended complaint does not allege any facts which plausibly suggest that any of the physical assaults allegedly experienced by plaintiff (1) were foreseeable by defendants Martuscello and Hilton, and (2) could have been prevented by additional or different training or supervision.  Moreover, DOCCS Directive No. 4943, which sets forth policies and procedures for body-worn cameras, was established in August 2024.  *See* https://doccs.ny.gov/Directives/4943.pdf (last visited Feb. 3, 2026).  Plaintiff expressly alleges throughout his pleading that certain corrections officials were equipped with body-worn cameras when interacting with him, and that he had multiple interactions with representatives from the Office of Special Investigations ("OSI").  *See* Am. Compl. at 2, 6, 8-11.[3]  In addition,

---

[3]  The Office of Special Investigations "serves as the . . . investigative body [for DOCCS], pursuant to Directive 0700 and Correction Law §§ 112 and 621."  https://doccs.ny.gov/office-special-investigations-osi (last visited Feb. 3, 2026).  Among other things, "OSI members respond to and investigate fatalities of incarcerated individuals; allegations of excessive force; sexual abuse and misconduct; [and] physical assaults and harassment[.]"  *Id.*  Pursuant to Fed. R. Evid. 201, a court may at any stage of a proceeding take judicial notice of "a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's

the amended complaint does not allege that corrections officials are never punished for physically harming and abusing inmates (by way of reassignments or terminations).  In other words, the Court has no basis to plausibly infer that defendants Hilton and Martuscello failed to take steps to prevent inmates from being assaulted by corrections officials leading up to the alleged assaults against plaintiff, let alone did so out of deliberate indifference to plaintiff's well-being.

Accordingly, plaintiff's Eighth Amendment claims against defendants Hilton and Martuscello based on use-of-force incidents are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 13. ADA Claim

Title II of the ADA "proscribes discrimination against the disabled in access to public services."  *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted).  The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id*. (citing 42 U.S.C. § 12132).

"In order to establish a prima facie violation under these acts, [an inmate] must show that 1) he is a qualified individual with a disability; 2) [the agency] is an entity subject to the

---

territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This includes information on the DOCCS website and DOCCS Directives. *See James v. Annucci*, No. 20-CV-6952, 2021 WL 3367530, at *6 (W.D.N.Y. Aug. 3, 2021) ("The Court may take judicial notice of documents on DOCCS' website" and "DOCCS Directives."); *Nimmons v. Fischer*, No. 11-CV-817, 2013 WL 4495006, at *10 (W.D.N.Y. Aug. 20, 2013) ("The court takes judicial notice that since 2010 DOCCS Directive 4914, which previously forbade non-Rastafarian inmates from wearing dreadlocks, has permitted dreadlocks be worn by any inmate regardless of specific religious designation.").

acts; and 3) he was denied the opportunity to participate in or benefit from [the agency's] services, programs, or activities or . . . otherwise discriminated against . . . by reason of his disability." *Wright*, 831 F.3d at 72 (citing *Henrietta D.*, 331 F.3d at 272). "For purposes of determining whether an ADA plaintiff is a 'qualified individual with a disability,' . . . the ADA defines 'disability' to include, inter alia, 'a physical or mental impairment that substantially limits one or more major life activities[.]'" *Hamilton v. Westchester Cty.*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (quoting 42 U.S.C. § 12102(1)(A)).

Title II of the ADA does not "provide[ ] for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Keitt v. New York City*, 882 F. Supp. 2d 412, 426 (S.D.N.Y. 2011) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act." (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). Accordingly, plaintiff's ADA claims asserted against named defendants in their individual capacities are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

Insofar as the amended complaint may be construed to assert official capacity claims against the named defendants, the Second Circuit has made clear that "an ADA claim for damages against a state (or state agency or official) is not barred by the Eleventh Amendment 'if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability.'" *Holly v. Cunningham*, No. 15-CV-0284, 2016 WL 8711593, at *5 (S.D.N.Y. June 17, 2016) (quoting *Garcia*, 280 F.3d at 112; *accord Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29, 2004)

(dismissing official capacity claims "under [§] 504 of the Rehabilitation Act and Title II of the ADA ... because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability")).

Here, the amended complaint fails to identify any DOCCS service, program, or activity that plaintiff was unable to participate in *because of* his medical condition, or a failure to accommodate it, let alone that any such deprivation was based on an official's discriminatory animus or ill will.  *See, e.g., Hall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-0377, 2015 WL 901010, at *3-6 (N.D.N.Y. Mar. 3, 2015) (dismissing ADA claims alleging disparate treatment and failure to reasonably accommodate the plaintiff's mental illness, where the plaintiff's denial of access to programs and services was based largely on his conviction of disciplinary offenses, the complaint failed to allege that "non-mentally-ill inmates convicted of a disciplinary offense and serving a sentence in SHU" received access to those programs, and the complaint largely complained of the adequacy of his mental health treatment rather than discrimination); *Roberts v. City of New York*, No. 14-CV-5198, 2016 WL 4146135, at *9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA claims where the plaintiff failed to allege that he "was excluded from participation in any program or activity, or otherwise treated differently, because of" his diabetes, and his claims sounded in medical malpractice rather than disability discrimination); *Chambers v. Wright*, No. 05-CV-9915, 2007 WL 4462181, at *4 (S.D.N.Y. Dec. 19, 2007) (dismissing ADA claims where the "[p]laintiff d[id] not make any allegations concerning [the] [d]efendants' discriminatory animus or ill will"); *Renelique v. Goord*, No. 03-CV-0525, 2006 WL 2265399, at *11 (N.D.N.Y. Aug. 7, 2006) (dismissing official capacity claims under the ADA where the plaintiff did "not allege[ ] any

facts that would support a conclusion that [the] [d]efendants acted with discriminatory animus or ill will toward him").

Accordingly, insofar as the amended complaint may be construed to assert ADA claims against named defendants in their official capacities, those claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## IV.    PRELIMINARY INJUNCTION MOTION

In his Preliminary Injunction Motion, plaintiff seeks an order "allowing OUD patients [including himself] to access medical services more than once daily; providing access to all sublingual formulations of Buprenorphine; . . . removing the policy that patients may not receive more than 16 mg dosages; and providing individualized treatment with deference to what is most effective for the patient." *Id.* at 1. Plaintiff further seeks an order directing that he receive the prescriptions and orders made by Dr. Chaudhry on August 22, 2025. *Id.*

Insofar as plaintiff seeks injunctive relief on behalf of anyone other than himself, the law is well-settled that plaintiff does not have a constitutional right to litigate matters on behalf of a third party, nor does he have standing to raise claims based on alleged injuries suffered by a third party. *See, e.g., Smith v. Fields*, No. 95-CV-8374, 1998 WL 709815, at *4 (S.D.N.Y. Oct. 9, 1998) ("Throughout his Complaint Plaintiff alleges a use of deadly force against his brother, Thomas Smith. Plaintiff does not have standing to assert this claim, since he was not the victim of the deadly force." (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (holding that personal injury to the plaintiff is required under § 1983 to establish standing))).

41

Moreover, "a class action cannot be maintained by pro se litigants" because non-attorneys may not represent anyone other than themselves." *Miller v. Zerillo*, No. 07-CV-1719, 2007 WL 4898361, at *1 (E.D.N.Y. Nov. 2, 2007); *see also* 28 U.S.C. § 1654.

Accordingly, the Preliminary Injunction Motion is denied insofar as it seeks relief on behalf of anyone other than plaintiff. Insofar as the Preliminary Injunction Motion seeks relief related to plaintiff's medical treatment, the Court directs defendants to respond to the motion within thirty (30) days of completion of service on at least one defendant.

## V.    FURTHER FILINGS

This case has yet to proceed to service, and the Court has already invested considerable resources on the matter, having reviewed a 103-page handwritten complaint accompanied by over 140 pages of exhibits, followed by a 60-page single-spaced typed amended complaint accompanied by almost thirty handwritten pages of additional information provided in the Motion to Amend (Dkt. No. 17) and a supplemental submission (Dkt. No. 18).

In light of the Court's rulings herein, there are now more than twenty claims that remain in this action against twenty-five officials. Moreover, the vast majority of the claims asserted in the amended complaint have survived sua sponte review. The Court will not allow plaintiff to continue wasting precious judicial resources by expanding the scope of this action to include (1) allegations of wrongdoing known to him at the time he submitted his amended complaint, or (2) allegations of wrongdoing that can be included in a new action (such as allegations related to the "illegal strike" and supplemental allegations of wrongdoing). *See, e.g., McCray v. Patrolman N.A. Caparco*, 761 F. App'x 27, 30 (2d Cir. 2019) (summary order) (finding no abuse of discretion where district court "refus[ed] to allow an amended complaint with fifty additional pages of allegations encompassing unrelated

events occurring months and years later than those originally pleaded"); *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008) (Kahn, J., adopting, on de novo review, Report-Recommendation by Lowe, M.J.) ("Of course, granting a pro se plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading."), *aff'd*, 357 F. App'x 388 (2d Cir. 2009); *Adams v. N.Y. State Educ. Dep't*, No. 08-CV-5996, 2010 WL 4970011, at *9 (S.D.N.Y. Dec. 8, 2010) (collecting cases and noting that "[p]resenting again a pleading, written motion or other paper that was adjudicated deficient, without substantially addressing legal deficiencies previously adjudicated, violates the duty to conduct a reasonable inquiry into law" (internal quotation marks omitted)), *report and recommendation adopted as modified* 855 F. Supp. 2d 205 (S.D.N.Y. 2012), *aff'd sub nom. Hochstadt v. N.Y. State Educ. Dep't*, 547 F. App'x 9 (2d Cir. 2013) (summary order); *Amusement Indus. v. Stern*, No. 07-CV-11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 10, 2014) ("Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case."); *Mitchell v. Cuomo*, No. 17-CV-0892 (TJM/DJS), 2019 WL 1397195, at *3 (N.D.N.Y. Mar. 28, 2019) (adopting Magistrate Judge's recommendation to deny motion to supplement where "[t]he proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d)").[4]

Accordingly, plaintiff is advised that the Court will not (1) consider any further submissions from him until after receipt of the copies necessary for service, or (2) accept any

---

[4] Considering additional pleadings prior to the completion of service also only serves to delay consideration of the Preliminary Injunction Motion.

further pleading submissions from him until after the completion of service, at which point any

further amendment must be accompanied by a proper motion, and limited to identifying the

remaining "Doe" official in this case.  In the event plaintiff wishes to pursue claims that are

unrelated to his medical treatment, such as claims arising out of the "illegal strike," or claims

based on events that occurred after the filing of the amended complaint, he must do so by

way of a separate action.

VI.    **CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that the Motion to Amend (Dkt. No. 17) is **DENIED** as unnecessary; and it

is further

**ORDERED** that the amended complaint (Dkt. No. 16) is accepted for filing and will

supersede and replace the original complaint as the operative pleading; and it is further

**ORDERED** that the Clerk shall add the following officials to the docket as defendants:

(1) Corrections Sergeant Dundon; (2) Corrections Officer Stromecki; (3) Corrections Officer

Slate; (4) Corrections Lieutenant Wells; (5) Corrections Officer Smalls; (6) Superintendent

Delmar; (7) Corrections Officer Nicholas; (8) Nurse Garcia; and (9) Nurse Practitioner

Coriglianno; and it is further

**ORDERED** that the Clerk shall **REINSTATE** Laliberte, Fischer, and King as

defendants; and it is further

**ORDERED** that the following claims **SURVIVE sua sponte review**: (1) plaintiff's First,

Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth,

Thirteenth, and Fourteenth Retaliation Claims; (2) plaintiff's First Amendment mail tampering

claim against defendant Edict; (3) plaintiff's Fourth Amendment unlawful body search claims

against defendants Alfred and Dundon; (4) plaintiff's Eighth Amendment excessive force and sexual abuse claims against defendant Alfred; (5) plaintiff's Eighth Amendment excessive force claims against defendants Femia, Kachare, Freeman, and Stromecki; (6) plaintiff's Eighth Amendment failure-to-intervene claim against defendant Conway; (7) plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Femia; (8) plaintiff's Eighth Amendment failure-to-protect claim against defendants Laliberte, Edict, and John Doe #1; (9) plaintiff's Eighth Amendment failure-to-protect claim against defendant Alfred based on attempting to have plaintiff assaulted on or about October 5, 2024; (10) plaintiff's Eighth Amendment failure-to-protect claim against defendant Femia based on the events of October 20, 2024; and (11) plaintiff's Eighth Amendment medical indifference claims against defendants Kachare, Czerwinski, Mungo, Fischer, Storey, Tapia, Freeman, Stromecki, Femia, Slate, Delmar, King, Nicholas, Garcia, and Coriglianno based on preventing plaintiff from receiving adequate medical treatment; and it is further

ORDERED that plaintiff's individual capacity ADA claims are **DISMISSED with prejudice** as set forth above; and it is further

ORDERED that plaintiff's remaining Section 1983 claims are **DISMISSED without prejudice** and without leave to renew in this action pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted; and it is further

ORDERED that plaintiff provide the Court with twenty-five (25) copies of his amended complaint within **SIXTY DAYS** of this Decision and Order.  Plaintiff is further advised that the Court will not (1) consider any further submissions from him until after receipt of the copies necessary for service, or (2) accept any further pleading submissions from him until after the

completion of service, at which point any further amendment must be accompanied by a proper motion, and limited to identifying the remaining "Doe" official in this case.  For the sake of judicial efficiency, the Court will not permit plaintiff to file another proposed amended pleading that adds additional claims or defendants to this action; and it is further

**ORDERED** that, upon receipt from plaintiff of copies of his amended complaint for service, the Clerk shall issue summonses and forward them, along with the necessary copies of the amended complaint, to the United States Marshal for service upon defendants Alfred, Edict, Matz, Tazouac, Orisin, Conway, Kachare, Femia, Mungo, Czerwinski, Freeman, Stromecki, Wells, Slate, Delmar, Tapia, Fischer, Smalls, King, Nicholas, Dundon, Laliberte, Storey, Garcia, and Coriglianno.[5]  The Clerk shall forward a copy of the summons and amended complaint by electronic mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that upon the completion of service, a response to the amended complaint be filed by the surviving defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff must take reasonable steps to ascertain the identity of the "Doe" defendant remaining in this action through discovery, and when identified, seek to amend the complaint to add this individual as a defendant in this action pursuant to Federal Rule of Civil Procedure 15(a).  Plaintiff's failure to timely identify and serve this defendant will result in his termination from the action and dismissal of the claims asserted against him; and it is further

---

[5] The Clerk will not issue summonses for the remaining "Doe" defendant because service cannot be effectuated on unidentified individuals.

**ORDERED** that plaintiff's Preliminary Injunction Motion (Dkt. No. 20) is **DENIED** insofar as it seeks relief on behalf of anyone other than plaintiff.  Insofar as the Preliminary Injunction Motion seeks relief related to plaintiff's medical treatment, the Court directs defendants to respond to the motion within thirty (30) days of completion of service on at least one defendant; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the plaintiff.

**IT IS SO ORDERED**.


Dated: February 13, 2026
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge